**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| PAUL MARCHESE, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>PETMED EXPRESS, INC., MENDERES AKDAG and BRUCE S. ROSENBLOOM,<br><br>　　　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Paul Marchese ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PetMed Express, Inc. ("PetMed" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.　　This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired PetMed securities between

1

May 23, 2017 and August 22, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      PetMed Express, Inc. and its subsidiaries, doing business as 1-800-PetMeds, operates as a pet pharmacy in the United States. The Company markets prescription and non-prescription pet medications, health products, and supplies for dogs and cats to retail customers.

3.      Founded in 1996, the Company is headquartered in Delray Beach, Florida. PetMed's stock trades on the NASDAQ Global Select ("NASDAQ") under the ticker symbol "PETS."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PetMed engaged in questionable practices in connection with the sales and marketing of the Company's opioid products; (ii) the foregoing conduct, when it became known, would likely subject the Company to heightened legal and regulatory scrutiny; and (iii) as a result of the foregoing, PetMed's public statements were materially false and misleading at all relevant times.

5.      On August 23, 2017, *Aurelius Value* published a report entitled "PetMed: Exploiting America's Opioid Epidemic," alleging that the Company targets opioid users with Google ads and other marketing techniques aimed at facilitating the abuse of opioids. The report stated, in relevant part:

> It is our belief that the actual "secret sauce" lies in PetMed's efforts to aggressively market dangerous painkillers to human opiate addicts and drug users.
>
> Mr. Akdag and his team sell painkillers coveted by human opiate addicts. Chief among these is a dangerous and addicting synthetic opiate named Tramadol,

unique in that it is prescribed by vets to animals as well as by doctors to human cancer patients. The demand for Tramadol, a class IV substance, is now so high that addicts are even maiming their pets to get prescriptions.

PetMed is exploiting this crisis through a broad marketing blitz that features Tramadol in ads that specifically target human opiate users.

Using Google, which drives over 55% of the traffic to 1800petmeds.com, PetMed has deployed a vast predatory campaign that dangles ads featuring pictures of Tramadol to drug users searching for how to get high or quickly score a variety of different opiates, narcotics, and street drugs without a prescription. Egregiously, PetMed's ads even specifically bait opiate addicts searching for remedies for their withdrawal symptoms.

Online advertising is the lifeblood of PetMed's business and, according to data cited in this report, Tramadol ads are estimated to drive at least 25% of PetMed's paid search traffic. It is no coincidence, in our view, that PetMed has reported record financial results over the same period that its opiate ad campaign has expanded.

We believe that PetMed's marketing of dangerous drugs to human opiate addicts is likely to capture the attention of regulators. Both the FDA and DEA have taken a dim view of direct to consumer advertisements of controlled substances and we can find no precedent of a pet pharmacy advertising to humans.

6. On this news, PetMed's share price fell $3.19, or 8.09%, to close at $36.22 on August 23, 2017.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). PetMed's principal executive offices are located within this Judicial District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12. Plaintiff, as set forth in the attached Certification, acquired PetMed securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant PetMed is incorporated in Florida, with principal executive offices located at 420 South Congress Avenue, Delray Beach, Florida, 33445. PetMed's shares trade on the NASDAQ under the ticker symbol "PETS."

14. Defendant Menderes Akdag ("Akdag") has served at all relevant times as the Company's Chief Executive Officer ("CEO"), President and Director.

15. Defendant Bruce S. Rosenbloom ("Rosenbloom") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Principal Accounting Officer and Treasurer.

16. The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

17. The Company and the Individual Defendants are sometimes referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     PetMed Express, Inc. and its subsidiaries, doing business as 1-800-PetMeds, operates as a pet pharmacy in the United States. The Company markets prescription and non-prescription pet medications, health products, and supplies for dogs and cats to retail customers.

### Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on May 23, 2017, when PetMed filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended March 31, 2017 (the "2017 10-K").  For the quarter, PetMed reported net income of $7.50 million, or $0.37 per diluted share, on revenue of $63.03 million, compared to net income of $5.42 million, or $0.27 per diluted share, on revenue of $55.39 million for the same period in the prior year. For 2017, PetMed reported net income of $23.82 million, or $1.17 per diluted share, on revenue of $249.18 million, compared to net income of $20.57 million, or $1.02 per diluted share, on revenue of $234.68 million for 2016.

20.     In the 2017 10-K, the Company stated, in relevant part:

*Marketing*

The goal of our marketing strategy is to build brand recognition, increase customer traffic, add new customers, build strong customer loyalty, maximize reorders, and develop incremental revenue opportunities. We have an integrated marketing campaign that includes online marketing, direct mail/print and e-mail.

*Online Marketing*

We advertise and market our products primarily online. We make our brand available to Internet consumers by purchasing targeted keywords and achieving prominent placement on the top search engines and search engine networks, including Google, Bing™, and Yahoo®. We utilize Internet display and video advertisements, social media, and comparison shopping, and we are also members of the LinkShare Network, which is an affiliate program with merchant clients and affiliate websites.

***

**Government Regulation**

       Dispensing prescription medications is governed at the state level by Boards of Pharmacy, or similar regulatory agencies, of each state where prescription medications are dispensed. We are subject to regulation by the State of Florida and are licensed as a community pharmacy by the Florida Board of Pharmacy. Our current license is valid until February 28, 2019, and prior to that date a renewal application will be submitted to the Board of Pharmacy. During fiscal 2015 we obtained a federal registration, and state registrations/permits as required, to dispense Schedule IV controlled substances. We recently updated our federal registration to include the ability to dispense Schedule V controlled substances, and are in the process of obtaining state registrations/permits as required, to dispense Schedule V controlled substances. Our pharmacy practice is also licensed and/or regulated by 49 other state pharmacy boards, the District of Columbia Board of Pharmacy, and the United States Drug Enforcement Administration, and with respect to our products, by other regulatory authorities including, but not necessarily limited to, the United States Food and Drug Administration ("FDA") and the United States Environmental Protection Agency. As a licensed pharmacy in the State of Florida, we are subject to the Florida Pharmacy Act and regulations promulgated thereunder. To the extent that we are unable to maintain our license as a community pharmacy with the Florida Board of Pharmacy, or if we do not maintain the licenses granted by other state pharmacy boards, or if we become subject to actions by the FDA, or other enforcement regulators, our distribution of prescription medications to pet owners could cease, which could have a material adverse effect on our financial condition and results of operations.

       21.    The 2017 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2017 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

       22.    On July 31, 2017, PetMed filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q1 2018 10-Q"). For the quarter, PetMed reported net income of $9.28 million, or $0.45 per diluted share, on revenue of $79.66 million, compared to net income of $6.59 million, or $0.32 per diluted share, on revenue of $72.49 million for the same period in the prior year.

23. In the Q1 2018 10-Q, the Company stated, in relevant part:

Advertising

The Company's advertising expense consists primarily of Internet marketing and direct mail/print advertising. Internet costs are expensed in the month incurred and direct mail/print advertising costs are expensed when the related catalogs, brochures, and postcards are produced, distributed, or superseded.

24. The Q1 2018 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2018 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25. The statements referenced in ¶¶ 19-24 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PetMed engaged in questionable practices in connection with the sales and marketing of the Company's opioid products; (ii) the foregoing conduct, when it became known, would likely subject the Company to heightened legal and regulatory scrutiny; and (iii) as a result of the foregoing, PetMed' public statements were materially false and misleading at all relevant times.

## The Truth Emerges

26. On August 23, 2017, *Aurelius Value* published a report entitled "PetMed: Exploiting America's Opioid Epidemic," alleging that the Company targets opioid users with Google ads and other marketing techniques aimed at facilitating the abuse of opioids. The report stated, in relevant part:

> It is our belief that the actual "secret sauce" lies in PetMed's efforts to aggressively market dangerous painkillers to human opiate addicts and drug users.

7

> Mr. Akdag and his team sell painkillers coveted by human opiate addicts. Chief among these is a dangerous and addicting synthetic opiate named Tramadol, unique in that it is prescribed by vets to animals as well as by doctors to human cancer patients. The demand for Tramadol, a class IV substance, is now so high that addicts are even maiming their pets to get prescriptions.
>
> PetMed is exploiting this crisis through a broad marketing blitz that features Tramadol in ads that specifically target human opiate users.
>
> Using Google, which drives over 55% of the traffic to 1800petmeds.com, PetMed has deployed a vast predatory campaign that dangles ads featuring pictures of Tramadol to drug users searching for how to get high or quickly score a variety of different opiates, narcotics, and street drugs without a prescription. Egregiously, PetMed's ads even specifically bait opiate addicts searching for remedies for their withdrawal symptoms.
>
> Online advertising is the lifeblood of PetMed's business and, according to data cited in this report, Tramadol ads are estimated to drive at least 25% of PetMed's paid search traffic. It is no coincidence, in our view, that PetMed has reported record financial results over the same period that its opiate ad campaign has expanded.
>
> We believe that PetMed's marketing of dangerous drugs to human opiate addicts is likely to capture the attention of regulators. Both the FDA and DEA have taken a dim view of direct to consumer advertisements of controlled substances and we can find no precedent of a pet pharmacy advertising to humans.

27.     On this news, PetMed's share price fell $3.19, or 8.09%, to close at $36.22 on August 23, 2017.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PetMed securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants

8

herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PetMed securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PetMed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PetMed;

9

- whether the Individual Defendants caused PetMed to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PetMed securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- PetMed securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold PetMed securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

36. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

11

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PetMed securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PetMed securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

41. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PetMed securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PetMed' finances and business prospects.

42. By virtue of their positions at PetMed , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

43. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of PetMed, the Individual Defendants had knowledge of the details of PetMed' internal affairs.

44. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PetMed. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PetMed' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PetMed securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PetMed' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PetMed securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

45. During the Class Period, PetMed securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PetMed securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of PetMed securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PetMed securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

46. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

47. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. During the Class Period, the Individual Defendants participated in the operation and management of PetMed, and conducted and participated, directly and indirectly, in the conduct of PetMed' business affairs. Because of their senior positions, they knew the adverse non-public information about PetMed' misstatement of income and expenses and false financial statements.

50. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PetMed'

financial condition and results of operations, and to correct promptly any public statements issued by PetMed which had become materially false or misleading.

51. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PetMed disseminated in the marketplace during the Class Period concerning PetMed' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PetMed to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PetMed within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PetMed securities.

52. Each of the Individual Defendants, therefore, acted as a controlling person of PetMed. By reason of their senior management positions and/or being directors of PetMed, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PetMed to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PetMed and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PetMed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

  A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

  B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

  C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

  D. Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 7, 2017

Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein (FL Bar ID# 144088)
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: 954-515-0123
Facsimile: 866-300-7367
Email:  jgoldstein@sfmslaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
   ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email: peretz@bgandg.com

*Attorneys for Plaintiff*